IN THE UNITED STATES DISTRICT COURT FOR THE

WESTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,   )
                            )
           Plaintiff,       )
                            )
v.                          )   Case No. CR-08-41-L
                            )
LARRY DOUGLAS FRIESEN,      )
                            )
           Defendant.       )

**O R D E R**

This matter is before the court on the "Motion to Suppress Evidence Seized Pursuant to Search Warrant From the Location of 524 N.W. 17th Street, Oklahoma City, Oklahoma" **[Doc. No. 10]**, filed by Larry Douglas Friesen, the defendant in this matter. In a five-count indictment filed February 5, 2008, defendant is charged with making false statements to the Bureau of Alcohol, Tobacco and Firearms ("ATF") in violation of 18 U.S.C. § 1001(a)(2) (Counts 1-4), and possessing an unregistered 9mm machinegun in violation of 18 U.S.C. §922(o) (Count 5). Defendant's residence is located at 524 N.W. 17th Street in Oklahoma City. Defendant argues that evidence seized from his residence pursuant to a search warrant issued and executed in June of 2004 must be suppressed as the fruit of an illegal search conducted by ATF inspectors in 2003. Alternatively, defendant argues that the evidence must be suppressed because the underlying affidavit supporting the search warrant issued for defendant's residence failed to set forth sufficient facts for a finding of probable cause because the affidavit contains material omissions and false information

concerning the applicability (or inapplicability) of certain statutory provisions and alleged violations cited, the proper time, place and scope authorized for compliance inspections of a federally licensed firearms dealer, and the "misleading portrayal" that defendant voluntarily consented to the inspection of his home at the time of the initial compliance inspection.  *See* Defendant's Motion and Memorandum of Law in Support of Defendant's Request for Evidentiary Hearing, Doc. No. 20, p. 3.  Defendant's affidavit, attached as the only exhibit to his request for an evidentiary hearing, states in part:

> On the afternoon of February 19, 2003 ATF Inspectors Rowden and McGrew arrived at my office located at 1319 N. Shartel, in Oklahoma City, which was the licensed premises of my firearms business.
> The ATF Inspectors advised me that [they] were authorized under federal law to conduct a compliance inspection and that they would inspect all records and inventory.
> After I showed the inspectors all of the inventory and records located at my business premises, and explained that some of the inventory and records were at my house, I was told that I was required under law to provide all records and inventory and that they were authorized under the law to inspect all records and inventory, even those located at my residence, and they intended on doing so.
> I felt compelled to give access to my residence for the inspection, because I believed they had the authority, and I did not want them going to my residence without my presence or to create a scene in the business premises, because I also conduct my law practice at that location.  At the time, based on the Inspectors assertions of authority and intent to proceed to my residence whether I agreed or not, I acquiesced and did not object.  However, the inspection was not based on a voluntary "invitation" to accompany me to my residence.  I simply felt there was no other choice.
> I was never told that my consent was necessary to conduct the inspection of my residence, nor did I believe at the time that my consent was necessary to continue the compliance inspection at my residence, because the inspectors were adamant that they had lawful authorization to do so.

> While I never felt physically threatened during my encounter with the ATF Inspectors, I was certainly unnerved by their presence and their apparent authority, based on their statements, to go through my private residence and search wherever they believed a firearm might be located. The tone of the encounter, while not openly hostile, became intimidating due to the Inspectors' obvious belief that I was involved in some sort of criminal activity. At no time did I voluntarily consent to an inspection of my residence.

Defendant's request for a hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978) is based on his allegations that the search warrant affidavit of ATF Special Agent Delbert Knopp contains repetitive and false statements regarding the February 2003 compliance inspection. It is a violation of the Fourth Amendment to "knowingly and intentionally, or with reckless disregard for the truth," include false statements in an affidavit filed in support of issuance of a search warrant. Franks, 438 U.S. at 155-56. The standards of deliberate falsehood and reckless disregard mentioned in Franks apply to material omissions as well as affirmative falsehoods. United States v. McKissick, 204 F.3d 1282, 1297 (10th Cir. 2000). A search warrant must be voided and the fruits of the search suppressed where a court (1) finds that the affiant knowingly or recklessly included false statements in or omitted material information from an affidavit in support of a search warrant and (2) concludes, after excising such false statements and considering such material omissions, that the corrected affidavit does not support a finding of probable cause. Franks, 438 U.S. at 155-56; United States v. Kennedy, 131 F.3d 1371, 1376 (10th Cir. 1997). Before a defendant is entitled to a Franks hearing, however, he must make a substantial preliminary showing that the affiant made a false statement or omission knowingly and intentionally, or with reckless disregard of the truth, and that the

alleged falsehoods or omissions would have vitiated the probable cause determination.  Id.  In other words, if the affidavit still supports a finding of probable cause even after the allegedly false statements are excluded or the omitted material is considered, then no hearing is required.  Franks, 438 U.S. at 171-72.  If the defendant establishes at the evidentiary hearing by a preponderance of the evidence that the false statement was included in the affidavit by the affiant "knowingly and intentionally, or with reckless disregard for the truth," and the false statement was "necessary to the finding of probable cause," then the Supreme Court has ruled that "the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit."  Kennedy, 131 F.3d at 1376 (citations omitted).

Here, the government argued that a Franks hearing was unnecessary because the facts demonstrate that defendant voluntarily consented to an inspection of his residence in February of 2003, as outlined in the search warrant affidavit.  In light of the conflict between the search warrant affidavit and defendant's own affidavit in which he states he did not voluntarily consent to an inspection of his residence in February of 2003, the court concluded that the issue of the voluntariness of defendant's consent to search his residence should be explored at a hearing.  On August 1, 2008, the court held an evidentiary hearing on the motion.  The testimony from the hearing is summarized below.

At the hearing, the government called one witness, Valerie Rowden, a long-time investigator with the ATF.  Rowden testified that from 1997 to 2003, she has conducted "more than several hundred" inspections of federal firearms

licensed ("FFL") dealers. On February 19, 2003, Rowden and another investigator named McGrew conducted a routine compliance inspection at 1309 N. Shartel in Oklahoma City, which was the licensed address for defendant, who was licensed to sell firearms, subject to federal law and regulations. According to Rowden, defendant had held his FFL for approximately ten years. Defendant had a Class 3 license, Title II, which allowed to defendant to sell weapons such as machine guns and silencers. Defendant had relinquished his Class 3 license in 1997 after having it for approximately three years. Rowden testified that defendant's paperwork indicated that he had not been inspected for ten years, and that he had not sold any weapons in the last year (prior to the inspection).

Regarding the February 19, 2003 compliance inspection, Rowden testified that between 8:00 and 9:00 a.m., she and McGrew arrived at the 1309 Shartel address, also known as "Lobo Arms." Defendant was not there. Rowden testified that she and her partner were dressed in slacks and blouses and were not carrying firearms. Defendant arrived, and was informed that the investigators were there to conduct an FFL compliance inspection. Defendant responded, "What do you need?" and was very compliant. Rowden testified that defendant did not protest in any manner, and informed her that the majority of his firearms and records were at his residence.

The investigators first went to defendant's office, which was upstairs at the 1309 Shartel address. Defendant had three firearms there, which were inventoried by the witness. Defendant said the remainder of his inventory of guns as well as his records were at his home. According to Rowden, defendant said "we can go there right now – you can ride with me or follow me." The

investigators followed him to 524 N.W. 17th Street.  The investigators did not walk through the entire house, but walked through the living room and directly downstairs to a basement safe.  At this time, defendant's demeanor was the same as it had been at his office.  It took "five minutes, max" to drive to the home.

The basement safe was "very large," 8 by 6 feet, made of steel with a combination lock.  In conducting the inventory of the basement safe, Rowden testified that defendant would hand her a gun from the safe, Rowden would describe the firearm, and McGrew would record the descriptions.  The inventory of the basement safe took one to two hours.  They were "chatting the entire time" and the inventory was described as friendly in nature.  Defendant talked to the ATF investigators about other law enforcement officers he knew and who he thought they might know.  Rowden described the relationship with defendant as "very comfortable."  She testified that although she had not had anyone refuse an inspection from 2003 to 2008, if a person did refuse, she would explain her authorization to inspect the firearms.  If the person still refused, she would record the refusal, leave, and contact her supervisor and legal counsel to probably obtain an administrative warrant.

Rowden testified that, as for defendant's compliance inspection, she felt very comfortable about going offsite, that is from the initial office location to defendant's residence.  She stated that she had the authority to look at gun inventory in storage.

During the inventory process, defendant made general comments on the different firearms including, for example, where they were obtained.  Defendant would occasionally say that certain guns were his personal firearms, however,

Rowden testified that the firearms were not marked or segregated as personal. Nor had defendant provided any records from which it was able to determine which guns were defendant's personal firearms.  Rowden had asked for defendant's records, but he had given her no records while they were at his office.  At his home, defendant gave Rowden a binder of NFA (National Firearms Act) guns.  Rowden testified that she recorded approximately 46 guns, however, defendant said he could not find his records relating to the guns.  Defendant advised Rowden that he had a gun upstairs in his home, and he retrieved this gun as well.

At this time, the investigators and defendant returned to his office address to continue the inspection.  At this time, defendant said that the investigators could not enter his personal office because someone else, a co-worker, was using his personal office.  Defendant's demeanor was very calm.  He told the investigators that he had "just realized" that they could not enter his personal office, but said they could come back later in the day.  Rowden testified that she and McGrew returned to the office approximately four hours later, and that having to stop temporarily and continue the investigation later in this manner was very common. Upon the investigators' return, Rowden noticed no radical change in defendant's demeanor.  There were several NFA guns in Rowden's registry that the investigators had not seen and defendant said they were in his office.  The investigators and defendant "continually" talked about his business records, but defendant was not able to produce them.  At his home, defendant had told Rowden that Bobby Hunter of the Edmond Police Department had one of his silencers and that other NFA weapons were in his office.   At the office, there was

an ongoing discussion about the missing records.  Defendant was very calm and said he would look for the records and would find them.  Defendant told the investigators to "come back tomorrow" and he would have the records.  Day one of the compliance inspection thus concluded.

On February 20, 2003, Rowden returned to defendant's office to continue the compliance inspection.  Defendant said he had still not found the records, but would do everything he could to find them and would call when they were discovered.  According to Rowden, defendant was relaxed, cooperative, and seemed truly concerned that he could not find the firearms records.

Six days later, on February 26, 2003, Rowden returned alone to pick up the records defendant said he had found.  This meeting at defendant's office lasted no more than ten minutes.

On February 27, 2003, Rowden and McGrew returned the records to defendant's office at which time he indicated that there were seven additional firearms he had failed to show them at his residence.  Defendant said the investigators could inventory these firearms, but not that afternoon.  There was no change in his demeanor.

On March 4, 2003, Rowden was not present when McGrew and an ATF supervisor went to defendant's residence to look at the guns defendant had mentioned.  During this visit, defendant gave McGrew a list of his personal firearms.  Rowden testified that she had previously told defendant that he needed a personal firearms registry.

Rowden testified that back on February 19, 2003, during the second visit to defendant's office, defendant had told her and McGrew that they were both

attractive, professional women. Defendant invited both of them to be on his radio talk show. Rowden said that she later received two or three invitations from defendant, inviting her to defendant's annual cookout.

Rowden said defendant's compliance inspection was "very ordinary." She testified that she and McGrew went to defendant's residence in the course of the February 19, 2003 compliance inspection because defendant invited them. She knew defendant was an attorney.

On cross-examination, Rowden described her "credentials" which identify her as an ATF agent. The credentials have a round emblem on the outside. She said that it would be normal during a compliance inspection for investigators to identify themselves with their credentials. She also testified that she had prepared a report regarding defendant's compliance inspections. She said that at the time of the inspection, she had a list showing defendant's NFA weapons. Two of the NFA firearms were listed to defendant, the remainder were listed to Lobo Arms. Rowden said that all of the NFA weapons on the list could be for sale.

Rowden identified Delbert Knopp, who was at the time of defendant's compliance inspection a criminal investigator and Special Agent with the ATF. She testified that she discussed defendant's compliance inspection with Knopp, and that this type of discussion was "very normal." Knopp had referred defendant for a compliance inspection, however, according to Rowden, defendant/Lobo Arms had been selected for compliance inspection apart from and before the referral by Agent Knopp. The referral, which mentioned that no compliance inspection had ever been conducted with respect to defendant/Lobo Arms did not

suggest the investigation of specific guns.  Rowden testified that she did not talk to Knopp specifically regarding defendant's compliance inspection before February 19, 2003.  She couldn't say exactly when she talked to Knopp, but she said she did speak to him during the course of defendant's compliance inspection.

Rowden's file reflected no sales by defendant in the previous three years before the compliance inspection.  Rowden said she had read Agent Knopp's affidavit for search warrant (attached as an Exhibit to defendant's Motion to Suppress), and takes no issue with anything stated in the affidavit.  Citing Industry Circular 72-30, Rowden testified that if guns are found to be commingled or unmarked during an inspection, she has the authority to inventory all the weapons.  She said that persons are normally not given notice prior to the compliance inspection.  She said that she had not gone to a "place of storage" to inventory weapons before defendant's inspection.  Rowden testified that defendant "immediately" offered to take her and McGrew to his home during the compliance inspection.  She stated that she did not tell defendant that he was not required to take them.  According to Rowden, defendant appeared to be compliant during the investigation.  Regarding Knopp's referral, Rowden testified that this was a normal procedure within the ATF.

Defendant also presented one witness at the hearing, the defendant Doug Friesen.  Defendant, who is an attorney, said that he had become an FFL dealer in 1993.  As of November, 2003, defendant no longer has his license.  Also, his license to buy and sell Class 3 firearms was given up in 1997.  According to defendant, when he gave up his Class 3 license, the guns previously registered

to Lobo Arms automatically became registered to the owner of Lobo Arms, *i.e.,* defendant.  Prior to February 19, 2003, defendant testified that he had no direct involvement in a compliance inspection, however, through his employment with H&H Gun Range, he had some familiarity with such inspections.  Defendant testified that he believed any weapons he had that were part of Lobo Arms' business were subject to inspection by the ATF.  Defendant testified that at the time of the inspection he could not find his acquisition and disposition records.  Defendant testified that the ATF "should have known" that the Class 3 weapons were his personally, and were not subject to the compliance inspection.  Defendant was told by the investigators that they "needed to see all of his weapons and his records."  Defendant says he was told that they "had to see" the remainder of his firearms.  He did not consider this a request, he felt that he did not have a choice, so he "took them over to the house."  In his testimony, defendant attempted to draw a distinction between being asked by the agents to look at his guns and records, and being told by the agents that they were going to see his guns and records.  Defendant testified that his position is that a person doesn't "argue, fight, or confront" law enforcement officers.  He considered the investigators' demand to be polite, but a demand that "we have to see all your firearms."  Defendant, who was present during the testimony of ATF investigator Rowden, testified that the basic comments Rowden made during her testimony were correct.

     Regarding defendant's statement during the compliance inspection when he told the investigators they could not visit his personal office, defendant testified that another attorney was using his office for initial client interviews.  Defendant

thought it would be counter-productive to attorney/client relations to disturb the client interview to retrieve weapons from the office.  Defendant testified that it almost seemed to him that the investigators thought he was misrepresenting the circumstances surrounding the other attorney using his office.  He said that the investigators came back to visit his office later that day.

      Defendant testified that he had a tough time finding his records.  He said they were supposed to be in his law office.  He described how his law office had been under constant construction work and re-decorating.  After 1996, when the defendant stopped selling guns, he said he focused on getting his law office ready for clients.  Defendant had taken his log book home because of all the contractors coming in and out during the law office renovation.

      Defendant said that he stopped selling firearms as Lobo Arms in 1997.  He "lost track of it."  In 2001, when his law office was finally finished, the construction workers moved over to his house.  Defendant testified that he ultimately found his records.  Defendant was familiar with his own affidavit (attached as an Exhibit to defendant's Motion in Support of Defendant's Request for Evidentiary Hearing, Doc. No. 20), and said that he did not voluntarily consent to the search of his residence on February 19, 2003.

      Upon cross-examination, defendant testified that, after a brush with the law in Kansas, he had received his Oklahoma law license in 1987, practicing for the first 2 or 3 years as a sole practitioner.  Initially, defendant had some "motorcycle enthusiasts" as clients, and he testified that he spearheaded opposition to a proposed motorcycle helmet law.  By February 19, 2003, defendant had another attorney working for him, and there could have been another attorney who also

worked for him.  At the time of the compliance inspection, defendant had 8 to 10 employees.  He described his practice as a general practice, performing criminal, domestic, probate, civil litigation, personal injury, small business consultation, administrative law – mainly in connection with concealed-carry requirements of the Oklahoma State Bureau of Investigation.  He testified that he practiced law in connection with the Health Department and therapists and also dealt with license revocations by the Department of Public Safety.  Defendant testified to a working knowledge of criminal and civil law.  He said that guns are a part of his lifestyle and that he is a gun enthusiast.  Defendant has researched firearms law and has attended lots of classes and has taught classes regarding the use of force.  He learned of the right of the ATF to conduct compliance inspections in order to look at business records and compare the records to the dealers' inventory to ensure compliance with the laws regulating the buying and selling of firearms.  Defendant was aware that specialized license holders were also subject to compliance inspections.  He said he was intimately aware of the regulations.  Defendant testified that he had been the host of a radio talk show.  He said that he has tried criminal cases in which consent was an issue.  He said that he had represented a couple of gun dealers with respect to compliance inspections prior to 2003.

     Defendant testified that when the ATF investigators said "we have to" see his weapons, he "acquiesced" and said "OK, we'll go."  Defendant did not dispute that he told the investigators to follow him to his home.  He said that it was "not his job" to argue or fight with law enforcement officials.  "They had a badge – they had authority."  He said that he had not researched whether ATF investigators are actually "law enforcement officers."  To him, "they were and are."

Defendant admitted that his "personal" and "business" firearms were commingled. He again testified that he "acquiesced" because the investigators said they "had to see" the weapons and records. As for why he allowed the compliance inspection to continue over the course of several days while now maintaining that his will being overborne by the investigators, defendant testified there was no need to object since "any damage was already done" after the first day. Defendant testified that ATF investigator Rowden "said nothing different" that what he testified to at the hearing.

In considering the submissions of the parties and all of the evidence that has been presented, the court concludes that defendant freely and voluntarily consented to the search of his residence during the February 19, 2003 compliance inspection by the ATF investigators. In making this determination, the court has considered the totality of the circumstances. In determining voluntariness, it is proper for the court to consider whether the consent was "unequivocal and specific and freely and intelligently given," and whether it was given without duress or coercion. United States v. Mendez, 118 F.3d 1426, 1432 (10th Cir. 1997)(citations omitted). Whether a consent to search was in fact voluntary or was the product of duress or coercion, expressed or implied, is a question of fact to be determined by the totality of the circumstances. United States v. Glover, 104 F.3d 1570, 1583 (10th Cir. 1997). In determining whether a consent to search is voluntary, a court should consider the following: physical mistreatment, use of violence or threats of violence, promises or inducements, deception or trickery, and the mental condition and capacity of the defendant. Id. (citation omitted). Although defendant may have "felt" that he was required to

acquiesce to the ATF investigator's demands, the court concludes that his feelings, which were undisputedly unexpressed during the compliance inspection, are not determinative.  Viewing all the facts in their totality, it is clear that defendant's consent to allow the inspectors to continue the inspection at his residence was unequivocal and specific.  When certain firearms and records were not found at defendant's business, the facts demonstrate that defendant led the investigators to his residence, where he claimed the firearms and records were located.  Defendant testified that he was trying to be helpful during the inspection and he does not dispute that he told the investigators to follow him to his residence.  There is no evidence that investigators Rowden or McGrew threatened, deceived, or harassed defendant or acted in a commanding or coercive manner in obtaining his permission to go to his residence.  The record shows that during the time the investigators were at defendant's office, and also while they were at his home, defendant's demeanor was calm, relaxed and cooperative.  Rowden testified that she felt comfortable going offsite, *i.e.,* to defendant's residence, to continue the compliance inspection.  The court accepts Rowden's testimony that the reason they went to defendant's residence to continue the inspection was because defendant invited them there.  The investigators did not walk throughout the entire house, but proceeded directly to the basement safe downstairs.  The totality of the evidence surrounding the February 19, 2003 compliance inspection does not indicate an atmosphere where an individual such as defendant, a knowledgeable and experienced attorney, would feel compelled to permit the investigators to continue their investigation at his home.  Further, the court does not believe that the totality of the

circumstances show that defendant was intimidated in any way to acquiesce to a search of his residence.  To the contrary, the facts show that defendant refused to allow the investigators to continue their investigation in defendant's private office when he felt that to allow such an intrusion would be potentially harmful to client relations.  Therefore, defendant was able to express his concerns to the investigators and was able to, and did, disagree with them when he refused to interrupt the client meeting.  Because the court concludes that defendant consented to the February 19, 2003 compliance inspection at his residence, defendant's motion to suppress relating to evidence seized from his residence should be and is hereby denied.

The court finds that defendant has also failed to demonstrate falsity or reckless disregard for the truth in the search warrant affidavit submitted by ATF Special Agent Knopp.  There was no evidence that Agent Knopp made a false statement knowingly and intentionally, or with reckless disregard for the truth.  As shown above, the court has concluded that defendant voluntarily consented to the inspection of his residence by the ATF investigators.  Thus, Agent Knopp did not misrepresent the inspection of the residence as consensual in his search warrant affidavit.  Although Agent Knopp did not testify at the hearing, ATF investigator Rowden testified that she had read the search warrant affidavit and took no issue with the facts recited there.

The court rejects defendant's speculation that Agent Knopp used the February 19, 2003 compliance inspection as a pretext to gain access to records and firearms, and then used that information to acquire a search warrant based on facts he knew were false and misleading.  The credible testimony of

investigator Rowden in this regard clearly shows that defendant/Lobo Arms had been selected for a compliance inspection before, and separate from, Agent Knopp's referral. Defendant never disputed this testimony, and, significantly, never came forward with any evidence to support the allegation that the compliance inspection was a pretext for gathering evidence in an attempt to establish probable cause for a search warrant.

      In summary, the evidence does not support a finding that the court must suppress the evidence obtained pursuant to the search warrant of defendant's residence. Accordingly, defendant's "Motion to Suppress Evidence Seized Pursuant to Search Warrant From the Location of 524 N.W. 17th Street, Oklahoma City, Oklahoma" **[Doc. No. 10]**, is **DENIED** in its entirety, as more fully set forth above.

      It is so ordered this 2nd day of September, 2008.

                                        */s/ Tim Leonard*
                                        TIM LEONARD
                                        United States District Judge